IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

ANGELIA TREECE RETHERFORD,
    Plaintiff,

vs.                                Case No.: 5:17cv232/EMT

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,
    Defendant.
_____/

## MEMORANDUM DECISION AND ORDER

This case has been referred to the undersigned magistrate judge for disposition pursuant to the authority of 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, based on the parties' consent to magistrate judge jurisdiction (*see* ECF Nos. 11, 12). It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act"), for review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34, and for supplemental security income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381–83.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

## I.     PROCEDURAL HISTORY

On April 3, 2014, Plaintiff filed applications for DIB and SSI, and in each application she alleged disability beginning December 1, 2013 (tr. 34).[1]   Her applications were denied initially and on reconsideration, and thereafter she requested a hearing before an administrative law judge ("ALJ").   A hearing was held on April 18, 2016, and on June 24, 2016, the ALJ issued a decision in which he found Plaintiff "not disabled," as defined under the Act, at any time through the date of his decision (tr. 34–47).   The Appeals Council subsequently denied Plaintiff's request for review.   Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court.   Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007).   This appeal followed.

## II.    FINDINGS OF THE ALJ

---

[1] All references to "tr." refer to the transcript of Social Security Administration record filed on January 25, 2018 (ECF No. 14).  Moreover, the page numbers refer to those found on the lower right-hand corner of each page of the transcript, as opposed to those assigned by the court's electronic docketing system or any other page numbers that may appear.

Case No.: 5:17cv232/EMT

In denying Plaintiff's claims, the ALJ made the following relevant findings (*see* tr. 34–47):

(1)     Plaintiff meets the insured requirements of the Act, for DIB purposes, through December 31, 2018[2];

(2)     Plaintiff has not engaged in substantial gainful activity since December 1, 2013, the alleged onset date;

(3)     Plaintiff has the following severe impairments: cervical degenerative disc disease, non-alcoholic steatohepatitis, gastritis, diverticulosis, diabetes mellitus type 2, hypertension, obesity, anxiety disorder, and depressive disorder;

(4)     Plaintiff has no impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments;

(5)     Plaintiff has the residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a).[3] Plaintiff can lift/carry and push/pull ten pounds occasionally and ten pounds frequently. With normal breaks in an eight-hour day, she can sit for six hours and stand and/or walk for six hours; she can occasionally climb ladders, ropes, and scaffolds; she can frequently climb ramps and stairs; she can frequently crawl; she is unlimited in balancing, stooping, kneeling, and crouching; and she can tolerate frequent overhead reaching with the left upper extremity and occasional exposure to vibration and hazards.

---

[2] Thus, the time frame relevant to Plaintiff's claim for DIB is December 1, 2013 (date of alleged onset), through June 24, 2016 (date of the ALJ's decision), even though Plaintiff is insured for DIB purposes through 2018. The time frame relevant to her claim for SSI is April 3, 2014 (the date she applied for SSI) through June 24, 2016. *See* Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005) (indicating that SSI claimant becomes eligible to receive benefits in the first month in which she is both disabled and has an SSI application on file).

[3] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. §§ 404.1567(a), 416.967(a).

Plaintiff can perform simple, routine, repetitive tasks; she can maintain concentration, persistence, and pace for these simple, routine, repetitive tasks for at least two hours at a time; and she can adapt to occasional changes;

(6)     Plaintiff is unable to perform any past relevant work;

(7)     Plaintiff was born on July 9, 1972, and was 41 years old, which is defined as a younger individual aged between 18 and 44, on the alleged disability onset date;

(8)     Plaintiff has a limited education and is able to communicate in English;

(9)     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Plaintiff is "not disabled," whether or not she has transferable job skills;

(10)    Considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform; therefore, Plaintiff has not been under a disability, as defined in the Act, from December 1, 2013, through the date of the decision.

## III.   STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); see also Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A determination

that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991). As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998); Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995). Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439. The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A). Pursuant to 20 C.F.R. § 404.1520(a)–(g),[4] the Commissioner analyzes a disability claim in five steps:

1.   If the claimant is performing substantial gainful activity, she is not disabled.

2.   If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3.   If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of

---

[4] In general, the legal standards applied are the same regardless of whether a claimant seeks DIB or SSI, but separate, parallel statutes and regulations exist for DIB and SSI claims (*see* 20 C.F.R. §§ 404, 416). Therefore, citations in this Order should be considered to refer to the appropriate parallel provision. The same applies to citations of statutes or regulations found in quoted court decisions. Additionally, the regulations cited in this Order are to those that were in effect at the time the ALJ issued his decision.

any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5.      Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her RFC and vocational factors, she is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work. 20 C.F.R. § 404.1512. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must then prove she cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.    PLAINTIFF'S PERSONAL, EMPLOYMENT, AND MEDICAL HISTORY

A.    Relevant Personal and Employment History

Plaintiff was forty-one years of age on the date she alleges she became disabled (tr. 239). She is 5'5" and at the time of her hearing weighed 263 pounds (tr. 87). She

previously worked as a pizza delivery driver and an assistant manager (tr. 88). Plaintiff last worked at a convenience store in 2014, where she sometimes felt "woozy" or "dizzy," felt like she had "panic attacks," and had trouble with her "sugar" (tr. 87–88). She testified that she was let go from this position when she failed to show up for work due to illness and failed to call in to report that she would be absent. She could not recall whether the illness was related to her diabetes or to her mental health issues (tr. 88, 100). Plaintiff stated she has not tried to find a job since this employment ended (tr. 88).

Plaintiff testified that she has a valid driver's license, but she no longer drives due to her diabetes and anxiety (tr. 144). Plaintiff is able to manage her own finances and personal care, bathe and dress without assistance, grocery shop, prepare simple meals, walk the dog, load the dishwasher, and sweep floors (tr. 90–91, 144). She testified she is able to walk for about thirty minutes at one time, stand for fifteen minutes at one time, sit for about an hour, and lift about ten pounds (tr. 91). On a typical day, Plaintiff wakes up, makes coffee, completes household chores, and sometimes goes out to visit her mother or attend a doctor's appointment (*id.*). She also watches television, uses a computer, and reads (tr. 144).

The ALJ asked Plaintiff to describe the "most severe thing that bothers [her]" and "keep[s] [her] from working" (*see* tr. 91). Plaintiff responded by stating, "my

mind," and then explained that her short and long-term memory are "bad," and that her family has to tell her things ten times because she has trouble remembering (tr. 91–92). She stated she does not "want to function," "get up out of bed," or "face life" (tr. 98). She testified that she hardly sleeps and slept only three hours the night before her hearing (tr. 99). Plaintiff claimed to have difficulty concentrating and stated that her mind "constantly goes, and goes, and goes, and goes" (*id*.). She testified that she had not obtained counseling because she "fight[s] it" (tr. 98). She also stated that if she had good insurance, she "might" get the "problem" treated (tr. 99).

As for her neck condition, Plaintiff testified she was "hurting real bad from looking over here," she could "hardly do [her] shoulders [sic]," and her neck causes "bad headaches" (tr. 93). She further testified that she has "trouble" turning her head to the right and left, and "problems" looking up and down (tr. 94). She stated that the pain travels to her head, both shoulders, and hands and several fingers, with her left side being worse than her right (tr. 94–95). She also testified that the pain affects what she can lift and carry, but that she can carry a ten-pound bag with her right hand (tr. 95). Finally, Plaintiff stated she has "problems" reaching out and overhead with her left arm (tr. 97).

B.    Relevant Medical History

Plaintiff was seen by Fernando Malamud, M.D., with complaints including fatigue, night sweats, and abdominal pain (tr. 676). During musculoskeletal examinations on February 12, 2014, and March 4, 2014, Plaintiff was found to have a normal gait and station, normal range of motion, and normal strength and tone, with no sensory or motor deficits (tr. 677, 680).

In May, June, and July of 2014, a physician who treated Plaintiff for her diabetes emphasized to Plaintiff the importance of engaging in "regular aerobic exercise regimens" (tr. 627, 625, 623). Similarly, in June of 2014, Plaintiff's gastroenterologist recommended "physical exercise 150 minutes a week" (tr. 608).

When Plaintiff presented for an NCV/EMG study of the upper extremities on June 10, 2014, she reported a history of numbness and tingling in the upper extremities, as well as grip weakness that was worse on the left (tr. 661). The study yielded "normal" results (id.). Two days later, an emergency provider with the Gulf Coast Medical Center noted that Plaintiff had full and painless range of motion and a normal gait (tr. 594). Likewise, treatment notes from June 16, 2014, reflect full range of motion and 5/5 muscle strength in all extremities (tr. 575). And progress notes from Emerald Coast Gastroenterology dated June 16 and June 30, 2014, reflect full range of motion and 5/5 muscle strength in all extremities (tr. 608, 611).

Similarly, treatment notes from February 19, February 24, May 21, and June 18, 2014, indicate that Plaintiff demonstrated a normal gait and had no muscle weakness (tr. 625–32). Additionally, visit notes from June 27 and July 22, 2014, reflect that Plaintiff had "5/5 normal muscle strength" in the left upper extremity, left lower extremity, and right lower extremity (tr. 605, 657, 667). Plaintiff also demonstrated a normal gait, but movement of the spine was "limited" (tr. 657, 667). On September 10, 2014, Plaintiff was seen at the St. Andrew Community Medical Center to "establish care" (tr. 718). Notes from this visit indicate she had full range of motion, 5/5 strength bilaterally, and a steady gait (tr. 720).

During an examination on February 12, 2015, Plaintiff complained of neck pain, but was found to have full range of motion (tr. 733). A CT scan obtained the same day revealed "degenerative changes at C6-7 and to a lesser degree [at] C5-6" (tr. 740). A treatment note from the next day states that Plaintiff had both "full ROM" and "[d]ecreased ROM" (tr. 733). An MRI obtained on August 2, 2015, revealed "[m]ild disk degeneration" at C6-7 and C5-6 (tr. 651). Finally, on February 18, 2016, Plaintiff reported chronic neck and back pain at an examination, but she was found to have 5/5 range of motion and strength (tr. 686).

With respect to Plaintiff's mental health conditions, the record shows that she primarily received treatment at the Vernon Family Health Center by Nurse

Practitioner ("NP") Dawn Frost, whose assessments included anxiety and depression (*see, e.g.*, tr. 369, 561, 563, 565). It appears that Plaintiff saw NP Frost originally in June of 2013 and then approximately nine or ten additional times, in August, September, November, and December of 2013, and in January, February, April, May, June of 2014 (*see* tr. 369–76).

On May 7, 2014, NP Frost, opined that Plaintiff was suffering from a "mental impairment that significantly interferes with her daily functioning," and she referred Plaintiff to Life Management (tr. 564).

Treatment notes from non-mental-health providers show that Plaintiff was oriented in all three spheres and had no memory loss during five office visits between February and July of 2014 (*see* tr. 624, 626, 628, 630, 632 (records from Sherief M. Kamel, M.D.)). Additionally, records from the Gulf Coast Medical Center and the Brain and Spine Center, show that Plaintiff was alert, and had normal speech, mood, affect, and judgment (tr. 594, dated June 12, 2014); that Plaintiff was not in acute distress, was alert, had no impairment of judgment or insight, and was able to recall recent events (tr. 575, dated June 16, 2014); and that Plaintiff's mood and speech were normal, and she was able to follow simple and complex commands (tr. 604, dated June 27, 2014 ). Also on June 27, 2014, Plaintiff's immediate recall, short-term memory, and long-term memory were all examined and determined to be normal (tr.

604). Her ability to calculate and abstract, her attention span, and her judgment were also all found to be within normal limits (*id*.). Finally, treatment notes from a gastroenterologist dated June 16 and June 30, 2014, show that in addition to being alert and fully oriented, Plaintiff was able to recall recent events and had no impairment in judgment or insight (tr. 608, 611).

As to Plaintiff's diabetes, she presented to Dr. Kamel with the Diabetes, Thyroid, and Endocrine Clinic, for treatment on February 19, 2014 (tr. 631). Dr. Kamel noted that Plaintiff had been taking Tradjenta for her diabetes and that it was "working well" (*id*.). When Plaintiff returned on February 24, 2014, Dr. Kamel noted that she was there for treatment for a goiter, for follow-up "to better control her thyroid condition," to adjust her medications if necessary, and to obtain "refills on her sugar pills" (tr. 629–30). Dr. Kamel assessed nontoxic multinodul goiter and noted that Plaintiff's past history included type 2 diabetes (*id*.). At a follow-up visit on May 21, 2014, Dr. Kamel noted that Plaintiff was still taking Tradjenta and per Plaintiff's own report her blood sugars had been "good" (tr. 627). Elsewhere in the same treatment note, however, Dr. Kamel remarked that Plaintiff's blood sugar was "still fluctuating" and that additional adjustments to her medications were necessary (*id*.). Dr. Kamel emphasized to Plaintiff the "importance of compliance with all prescribed medications," and Plaintiff stated she understood and would "try hard to be

compliant" (tr. 627–28). When Plaintiff returned on June 18, 2014, she told Dr. Kamel she was there because her "sugar [was] going very high," but she did not bring her logs with her as evidently she had been instructed to do (*see* tr. 625). Dr. Kamel noted Plaintiff had previously done "very well" on Tradjenta, 5mg, but because Plaintiff's readings were high at that visit Dr. Kamel switched Plaintiff to Glipizide, 10mg (*see* tr. 625–26). On July 18, 2014, Plaintiff again reported high and fluctuating blood sugar levels, and Dr. Kamel again emphasized the importance of compliance with prescribed medications and again adjusted her medication, this time by continuing the Glipizide, 10mg, but adding Bydureon, 2mg, to be used subcutaneously (tr. 623–24).

Plaintiff evidently did not return to Dr. Kamel after July of 2014, but other records show that she obtained treatment elsewhere for her diabetes, primarily at St. Andrew's. On September 10, 2014, Plaintiff advised a St. Andrew's clinician that she was taking Glipizide, 10mg, and Tradjenta, 5mg, but evidently made no mention of the Bydureon (*see* tr. 718), and if she was taking Tradjenta at that time it is unclear who prescribed it to her. In any event, Plaintiff also advised she had not taken the Glipizide or the Tradjenta for the past two weeks (tr. 718). It appears that Plaintiff was then prescribed Glipizide, 10mg, and Tradjenta, 5mg, initially at St. Andrew's, but by early January of 2016, she was prescribed only Glipizide, 5mg (*see* tr. 712).

Additional treatment records indicate that when Plaintiff took the Glipizide, her blood glucose levels were generally under control, for example, below 155 (*see* tr. 708) or between 60 and 157 (tr. 701), and/or she reported "doing well" (tr. 695). When she did not take her medication as prescribed, however, she encountered difficulties. For example, on December 3, 2015, Plaintiff presented to St. Andrew's with elevated blood glucose levels "running in the 300's" (tr. 692). It was specifically noted that Plaintiff had been taking the Glipizide, 5mg, "PRN" or only when she felt it was necessary, and the clinician stated, "I am not sure how that came to be" (*id.*). Plaintiff was again specifically instructed to "take all meds as directed" and to record her blood glucose levels at certain times over the next two weeks and return with her logs on December 22, 2015 (tr. 693). Plaintiff returned to the clinic on January 5, 2016, and the treatment note includes no specific mention of the logs, although it states that since December 16, Plaintiff's blood glucose levels had been between 86 and 205 (tr. 690). Plaintiff was continued on Glipizide, 5mg (*id.*). Finally, a treatment note from St. Andrew's, dated February 18, 2016, reflects Plaintiff's report that she was taking Glipizide, 2.5mg, and that it did not make her dizzy as the previous 5mg dosage had; her A1c was noted to be 6.5 (tr. 686). The same treatment note also shows that Plaintiff reportedly had not taken the Glipizide for the preceding two weeks, but that even so "her BG [were] all been below 170" during that time (*see* tr. 686).

C.     Other Information in Plaintiff's File

NP Frost, who indicated that her "specialty" is family medicine, completed a "Treating Source Mental Status Report" on May 13, 2014 (tr. 566, 568).   She described Plaintiff as sad and "anxious to the point of paranoia," with a flat affect and "not too much hope for a bright tomorrow" (tr. 566).   She noted Plaintiff's thought processes were normal but complicated by anxiety and fear (tr. 567).   She felt that Plaintiff did not demonstrate homicidal/suicidal thoughts or delusions, but had unrealistic thoughts about her care (*id*.).   Insofar as concentration, NP Frost noted Plaintiff had "flight of ideas at times" and jumped from one point to another (*id*.).   She found her to be oriented to person, place, and time (*id*.).   NP Frost opined that Plaintiff's recent and remote memory were impaired but her immediate memory was intact (*id*.).   She noted that Plaintiff could not concentrate, became easily distracted, had very poor recollection, and appeared to understand but then could not immediately repeat or respond (tr. 568).   NP Frost reported that Plaintiff did not suffer from hallucinations, but her perception was impaired regarding her health status (tr. 567).   She found Plaintiff to be cooperative and well-dressed but "jittery" (*id*.).   NP Frost offered diagnoses of anxiety, depression, and memory impairment with a "poor" prognosis (*id*.).   NP Frost noted that Plaintiff could not add or subtract and that her mother had to attend to her finances (tr. 568).   She felt that Plaintiff could not manage

her own benefits if any were awarded (*id*.). Finally, NP Frost opined that Plaintiff could not work or perform satisfactorily (*id*.).

Frances Martinez, Ph.D., a non-examining agency psychologist, offered her opinions at the initial level on May 20, 2014 (tr. 115–17). She assessed Plaintiff's abilities in approximately fifteen areas of mental functioning and found Plaintiff "not significantly limited" in eleven of those areas (*see* tr. 116–17). She found Plaintiff to be moderately limited in the following areas: (1) with respect to *memory*, in her ability to understand and remember detailed instructions (tr. 116); (2) with respect to *sustained concentration and persistence* (a) in her ability to carry out detailed instructions, and (b) in her ability to maintain attention and concentration for extended periods; and (3) with respect to *adaptive abilities*, in her ability to respond appropriately to changes in the work setting (tr. 116–17). In the spaces provided for offering explanations, Dr. Martinez made several comments about Plaintiff's ability to perform "SRT's," or simple routine tasks, as follows: Plaintiff "can perform SRT's" (in the "memory" section); Plaintiff "will have difficulty sustaining attention for SRT's" (in the sustained concentration and persistence section); and Plaintiff "can perform SRT's in a stable setting" and adapt to changes over time (in the adaptive abilities section) (tr. 115–17). Dr. Martinez also evaluated Plaintiff's anxiety and depression under the "B" criteria of the relevant listings and found mild limitations

in activities of daily living and maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, and pace (tr. 112).

Steven Wise, Psy.D., a non-examining agency psychologist, offered his opinions regarding Plaintiff's mental RFC at the reconsideration level on July 15, 2014 (tr. 149). He assessed the exact same limitations as Dr. Martinez with respect to the fifteen functional areas (*compare* tr. 115–17 *with* 149–51), and also reached the same conclusions as to the "B" criteria of the listings (tr. 145), but his explanatory comments differed slightly from hers. For example, with respect to sustained concentration and persistence, Dr. Wise stated that Plaintiff "[w]ill do best in less complex tasks and those not requiring extended concentration, though recon mer notes [believed to mean medical evidence of record (or treatment notes) available at the reconsideration level]" show that Plaintiff's attention and concentration are within normal levels (*see* tr. 150).

P.S. Krishnamurthy, M.D., a non-examining agency physician, assessed Plaintiff's physical capacities on July 25, 2014 (*see* tr. 149). As far as exertional limitations, Dr. Krishnamurthy found that Plaintiff could occasionally lift and/or carry twenty pounds; could frequently lift and/or carry ten pounds; could stand or walk with normal breaks for more than six hours on a sustained basis; could sit for more than six hours on a sustained basis; and was otherwise unlimited in pushing and pulling (tr.

147). As to postural limitations, Dr. Krishnamurthy found Plaintiff could frequently climb ramps/stairs; could occasionally climb ladders/ropes/scaffolds; could frequently crawl; and was unlimited in balancing, stooping, kneeling, and crouching, with no environmental limitations aside from vibration and hazards (tr. 147–49).

Next, upon referral from her attorney Plaintiff, was examined by Neda Koehnemann, Ph.D., on April 11, 2016 (tr. 670). Dr. Koehnemann found no evidence of a thought disorder, found Plaintiff to be oriented to all spheres, and noted Plaintiff was not currently prescribed any medication for depression or anxiety and had not previously obtained mental health counseling (tr. 672). Dr. Koehnemann noted that Plaintiff's primary relaxation is "playing games on her phone because it allows her to forget about other things" (tr. 670). Dr. Koehnemann administered the Wechsler Memory Scale and opined that Plaintiff has "significant memory deficits" (tr. 673). She also felt Plaintiff's level of anxiety and depression likely adversely affected her memory functioning, and that Plaintiff was in need of medical insurance and psychiatric treatment including medication and counseling (id.).

Finally, a Vocational Expert ("VE") testified at Plaintiff's hearing. The VE testified that a hypothetical person with Plaintiff's RFC could not perform her past relevant work as a pizza delivery driver, assistant manager, or restaurant manager trainee (tr. 102–03). The hypothetical person could, however, perform other available

work, including work as an inspector, assembler, or hand packager, all of which are unskilled jobs, performed at the sedentary level of exertion, and which otherwise accommodate Plaintiff's RFC (tr. 103). According to the VE, however, if the hypothetical person could not maintain concentration, persistence, and pace for at least two hours at a time, the person could perform no work (*id*.).

V.    DISCUSSION

Plaintiff raises three issues in this appeal, and various sub-issues, which the undersigned has rearranged for organizational purposes. Plaintiff generally claims the ALJ erred: (1) in evaluating her subjective complaints of pain and other symptoms; (2) in determining her RFC; and (3) in omitting moderate limitations in concentration, persistence, or pace from the hypothetical questions he posed to the VE.

A.    Evaluation of Plaintiff's Testimony

Plaintiff contends the ALJ erred in discrediting her testimony regarding pain, symptoms, and limitations.

In Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991), the court articulated the "pain standard," which applies when a disability claimant attempts to establish a disability through her own testimony of pain or other subjective symptoms. The pain standard requires: (1) evidence of an underlying medical condition and either (a) objective medical evidence that confirms the severity of the alleged pain arising from

that condition, or (b) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain. Holt, 921 F.2d at 1223 (internal citation omitted). If a claimant testifies as to her subjective complaints of disabling pain and other symptoms, as Plaintiff did here, the ALJ must clearly "articulate explicit and adequate reasons" for discrediting the claimant's allegations of completely disabling symptoms. Foote, 67 F.3d at 1561–62. Additionally, "'[a]lthough this circuit does not require an explicit finding as to credibility, . . . the implication must be obvious to the reviewing court.'" *Id.* at 1562 (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983)). The credibility determination does not need to cite "'particular phrases or formulations,'" but it cannot merely be a broad rejection which is "'not enough to enable [the district court or this Court] to conclude that [the ALJ] considered her medical condition as a whole.'" *Id.* (quoting Jamison v. Bowen, 814 F.2d 585, 588–90 (11th Cir. 1987)).

Here, the ALJ concluded that Plaintiff has medically determinable impairments that reasonably could be expected to cause some of her symptoms (tr. 41). Then, as the pain standard requires, the ALJ proceeded to address the extent to which the intensity and persistence of Plaintiff's symptoms limit her ability to work, citing the record to support his conclusion that Plaintiff's statements concerning the intensity,

persistence, and limiting effects of the symptoms are not entirely consistent with the medical evidence and other evidence in the record (*id*.).

Plaintiff first argues that the ALJ erred in finding the testimony regarding her *mental* limitations less than fully credible. In reviewing the mental health evidence of record, the ALJ noted the diagnoses of depression and anxiety (tr. 43). And in discounting the more extreme of Plaintiff's allegations, the ALJ observed that when Dr. Koehnemann evaluated Plaintiff in April of 2016: (1) Plaintiff displayed no evidence of a thought disorder of any kind, and she was oriented in all spheres; and (2) Dr. Koehnemann noted that Plaintiff had not been prescribed any medication for depression or anxiety prior to the evaluation, and that Plaintiff reported she had never previously obtained mental health counseling (*id*.). The ALJ acknowledged that Plaintiff scored anywhere from "extremely low memory functioning to borderline range of memory functioning" on memory testing administered by Dr. Koehnemann (*id*.), but he pointed out that Plaintiff had not followed up on a mental health treatment referral made previously in May of 2014 (*see* tr. 564).[5] The ALJ also noted Plaintiff's hearing testimony that her reason for not seeking mental health treatment was that she "fight[s] it" (tr. 43). The ALJ found that if Plaintiff's mental health impairments were as severe as she alleged, she would have pursued mental health treatment, and her

---

[5] The referral noted by the ALJ is the one made by NP Frost on May 7, 2014 (*see* tr. 564).

failure to do so suggests her symptoms and limitations are evidently not as serious as she claims (*id*.).

Plaintiff argues that the ALJ erred in considering her failure to seek mental health treatment. In support she cites Social Security Ruling ("SSR") 16-3p (ECF No. 22 at 18), which states that the agency "will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons . . . she may not comply with treatment or seek treatment consistent with the degree of [her] complaints," and that "an individual may not be able to afford treatment and may not have access to free or low-cost medical services."[6]

The court concludes that the ALJ did not err in considering Plaintiff's failure to obtain mental health counseling, given Plaintiff's own sworn statement that she "fights" getting treatment. Moreover, Plaintiff's testimony was equivocal on the matter of insurance being the determinative factor regarding treatment, in that she testified she "might" get treatment if she had insurance rather than explicitly stating she would in fact obtain treatment (*see* tr. 99). What is more, the referral to mental health treatment made in May of 2014 was to the Life Management Center (*see* tr.

---

[6] Plaintiff also cites <u>Ellison v. Barnhart</u>, 355 F.3d 1272, 1275 (11th Cir. 2003) ("when the ALJ relies on noncompliance as the *sole ground* for the denial of disability benefits, and the record contains evidence showing that the claimant is financially unable to comply with prescribed treatment, the ALJ is required to determine whether the claimant was able to afford the prescribed treatment") (emphasis added).

564), a community-based behavioral and mental health services center that provides services to clients of all income levels.[7]  It is therefore evident that Plaintiff could have obtained treatment, but she chose not to—even after a referral for such by the nurse practitioner she saw on a regular basis—and the ALJ did not err in considering Plaintiff's choice.  *See, e.g.*, <u>Watson v. Heckler</u>, 738 F.2d 1169, 1173 (11th Cir. 1984) (in addition to objective medical evidence, it is proper for ALJ to consider use of painkillers, failure to seek treatment, daily activities, conflicting statements, and demeanor at the hearing); *see also* <u>Williams v. Sullivan</u>, 960 F.2d 86, 89 (8th Cir. 1992) (absence of treatment indicates that a mental impairment is non-severe).  The court thus finds no error.

Plaintiff also argues that the ALJ erred in finding her testimony regarding *physical* limitations not fully credible.  Although Plaintiff lists gastrointestinal issues, hypertension, and obesity in her argument, Plaintiff failed to develop any claim as to these conditions, and Plaintiff offered no relevant testimony regarding any symptoms or limitations related to these conditions.  As such, these conditions will not be addressed further in the instant discussion.

---

[7] *See* Fed. R. Evid. 201(b)(1) ("The court may judicially notice a fact that is not subject to reasonable dispute because it is generally known within the trial court's territorial jurisdiction."). *See also* <u>www.lmccares.org</u> (last visited Jan. 30, 2019).

Turning to the physical conditions for which arguments can be discerned, the court first considers the ALJ's findings regarding Plaintiff's alleged neck pain and limitations. In concluding that these symptoms are not as severe as Plaintiff alleged, the ALJ pointed to various portions of the record, including: the "normal" NCV and EMG studies from June 10, 2014 (tr. 41); the full neck range of motion noted during an examination at the Gulf Coast Medical Center in February of 2015 (tr. 42; *see also* tr. 733); the results of the cervical spine x-ray obtained in February of 2015 (i.e., "degenerative changes at C6-7 and to a lesser degree at C5-6") (tr. 41); the results of the MRI obtained in August of 2015 (i.e., "mild" disc degeneration at C6-7 and C5-6) (*id*.); and full ("5/5") strength in the upper extremities and no sensory or neurological deficits" upon multiple physical examinations (*see id*. (referencing Exhibits 11F, 16F, and 20F, which are treatment records from the Brain and Spine Center and Saint Andrew's)). The ALJ did not err in identifying the foregoing portions of the record as inconsistent with Plaintiff's complaints of extreme and disabling neck limitations. *See* 20 C.F.R. § 404.1529(a) (an ALJ is permitted to consider the "extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence . . . . "); SSR 16-3p (eff. Mar. 28, 2016) (adjudicators will consider whether the "individual's statements about the intensity, persistence, and limiting effects of

symptoms are consistent with the objective medical evidence and other evidence of record").

With respect to her diabetes, as previously noted, Plaintiff testified that although she lost a prior job due to failing to call in when she missed work due to illness, she was unsure if the illness was related to her mental health issues or to her diabetes (tr. 100). She also noted being "woozy," "dizzy," and having "trouble with [her] sugar" (tr. 88). No other testimony regarding symptoms or limitations was offered as to this condition. In discussing Plaintiff's diabetes, the ALJ cited treatment records indicating that Plaintiff's blood sugar levels had been "uncontrolled, high, and fluctuating" at times but also pointed to the most recent treatment note from February of 2016, indicating that she was taking Glipizide, 2.5 mg, her blood glucose level was below 170, and her A1c was 6.5, as well as reports by Plaintiff that she was not dizzy when she took the lower dosage of her medication (tr. 42; *see also* tr. 143 (Plaintiff's report that she takes medication daily to control her diabetes (also indicating that Plaintiff did not require insulin))).

The ALJ's findings are supported by the record, and the ALJ properly considered that Plaintiff's diabetic condition can be controlled by treatment—when she takes it as prescribed—and in this case, conservative treatment in the form of (non-insulin) medication only. *See* <u>Dawkins v. Bowen</u>, 848 F.2d 1211, 1213 (11th

Cir. 1988) ("A medical condition that can reasonably be remedied either by surgery, treatment, or medication is not disabling.").  Additionally, the record also shows that Plaintiff might have lost her prior job due to a matter wholly unrelated to her diabetic condition (e.g., a different illness, failing to call in).

Continuing with respect to her physical conditions, Plaintiff raises another argument based on SSR 16-3p, relying on that part of the ruling which states that the agency "will not disregard an individual's statements about the intensity, persistence, and limiting effects [of an impairment] solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual." *See also* 20 C.F.R. § 1529(c)(2) (same, stating "we will not reject your statements about the intensity and persistence of your pain or other symptoms . . . *solely* because the available objective medical evidence does not substantiate your statements") (emphasis added).  Thus, it would be erroneous to deny a claim based only on a lack of objective medical evidence corroborating the extent of the limitations, but here the ALJ did not rely solely on a lack of substantiating medical evidence.  For example, the ALJ also considered Plaintiff's activities of daily living (tr. 38–39; *see also* tr. 144).  *See* Macia v. Bowen, 829 F.2d 1009, 1012 (11th Cir. 1987) (ALJ may properly consider daily activities when evaluating subjective complaints of disabling pain and other symptoms).  Additionally, although not

included specifically within his discussion of Plaintiff's credibility, the ALJ pointed out that Plaintiff worked in 2014, after the date she alleges she became disabled (tr. 36, citing tr. 269). *See* 20 C.F.R. § 404.1571 (work performed during any period in which a claimant alleges she was under a disability may demonstrate an ability to perform substantial gainful activity); Wolfe v. Chater, 86 F.3d 1072, 1078 (11th Cir. 1996) (in discounting Plaintiff's complaints of pain, ALJ did not err in considering fact that claimant worked washing mobile homes during the adjudicated period); *see also* Harris v. Barnhart, 356 F.3d 926, 930 (8th Cir. 2004) ("it was also not unreasonable for the ALJ to note that Harris's . . . part-time work [was] inconsistent with her claim of disabling pain").].  And, as previously noted, the ALJ noted the efficacy of Plaintiff's (conservative) treatment.

Finally, Plaintiff contends the ALJ erred in considering her lack of a consistent work history in discrediting her complaints of disabling limitations.  More specifically, the ALJ noted that for the past fifteen years Plaintiff had worked at a substantial gainful activity level only in 2005.  The ALJ concluded that this signified a weak employment motivation and also weakened her contention that, but for her medically determinable impairments, she would be working (tr. 45).

Although the undersigned has found no binding Eleventh Circuit case permitting consideration of this factor, other circuits permit it to be considered, as do

other district courts, and the Regulations appear to permit such consideration as well. *See, e.g.*, Schaal v. Apfel, 134 F.3d 496, 502 (2d Cir. 1998) ("There is no suggestion in SSA regulations that an ALJ may only consider *favorable* work history in weighing the credibility of claimant testimony. Just as a good work history may be deemed probative of credibility, poor work history may prove probative as well."); Sheline v. Comm'r of Soc. Sec., 241 F. Supp. 2d 1206, 1213 (D. Kan. 2002) ("[T]he ALJ appropriately considered the factors set forth by the Tenth Circuit in determining the credibility of Plaintiff's testimony. [Among other reasons], the ALJ discounted Plaintiff's credibility based on Plaintiff's poor work record prior to her alleged onset date of disability and her questionable work motivation."); *see also* Pisa-De Rubertis v. Colvin, No. 16-22015-CIV, 2017 WL 2833447, at *15 (S.D. Fla. June 30, 2017) ("The ALJ is to consider all of the evidence presented, including information about the claimant's prior work record. 20 C.F.R. § 416.929(c)(3). Moreover, the ALJ is specifically instructed that credibility determinations should take into account, as one of many factors, a claimant's 'prior work record and efforts to work.'") (citing SSR 96–7p; 61 Fed. Reg. 34,483, at 34,486 (1996); Schaal, 134 F.3d at 502). The ALJ considered Plaintiff's minimal work history in addition to the record as a whole, as described herein, and therefore his reliance on this factor was not improper.

In sum, with regard to Plaintiff's subjective complaints of pain and other symptoms, the undersigned, of course, is not charged with making independent fact conclusions, but only with reviewing the substantiality of the evidence underlying the conclusions reached by the ALJ. *See* Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). Having done so, the undersigned concludes that the reasons cited by the ALJ are supported by substantial evidence in the record, and that the evidence he cited was properly considered in evaluating Plaintiff's credibility. Accordingly, the ALJ did not err in discounting Plaintiff's assertions of disabling pain and limitations.

B.      ALJ's Residual Functional Capacity Determination

Plaintiff contends the ALJ erred in determining her RFC, in part because it failed to accurately account for limitations related to her obesity. Plaintiff also contends that the RFC was based upon an erroneous consideration of the opinions of Dr. Koehnemann, Dr. Martinez, Dr. Wise, Dr. Krishnamurthy, and NP Dawn Frost.

1.      Residual Functional Capacity — Defined

The regulations define RFC as that which an individual is still able to do despite the limitations caused by her impairments. 20 C.F.R. § 404.1545(a)(1). The ALJ will "assess [the claimant's RFC] based on all of the relevant medical and other evidence" in the case. 20 C.F.R. § 404.1545(a)(3). An ALJ need not include in the RFC limitations, restrictions, or opinions he has properly rejected or that are otherwise

unsupported by the record.  *See* <u>McSwain v. Bowen</u>, 814 F.2d 617, 620 n.1 (11th Cir. 1987).

<u>Obesity</u>

Plaintiff contends the ALJ erred by finding her obesity to be a severe impairment at step two (thereby causing "more than minimal limitations"), but then by "absolutely" failing to indicate in his decision "how, if at all, the ALJ considered her obesity in assessing her RFC" (ECF No. 22 at 14).

Plaintiff's argument is refuted by the record.  The ALJ specifically found that Plaintiff's obesity caused limitations, but he concluded it did not cause limitations beyond the requirements of reduced sedentary work, as set forth in Plaintiff's RFC (tr. 43).  More specifically, the ALJ found "[w]hile the claimant's obesity may exacerbate pain or other symptomologies, there is no indication that it would preclude her from performing the modified sedentary exertional residual functional capacity assessed herein" (*id*.).  Although Plaintiff generally cites SSR 02-01p in support of her argument (*see* ECF No. 22 at 13–14), which states that the ALJ should "consider any functional limitations resulting from the obesity in the RFC assessment, in addition to any limitations resulting from any other physical or mental impairments that we identify," in her brief Plaintiff has failed to identify or otherwise describe any obesity-

related functional limitation that is not otherwise accounted for in the RFC (*see id.*). And no such limitation is evident from the court's own review of the record.

To be sure, during her hearing Plaintiff cited her primary disability as her "mind" (tr. 91), and her secondary disability as her "neck" (tr. 92). She did not otherwise explicitly or implicitly state that her obesity caused any limitations on her ability to function, work, or perform activities of daily living, much less that it caused any such limitations *beyond those* accounted for in the RFC. Moreover, substantial evidence supports the ALJ's finding that despite Plaintiff's obesity, she could perform a reduced range of sedentary work. As summarized *supra*, Plaintiff's treatment notes consistently show that she had full "5/5" strength in her upper and lower extremities; full range of motion in her extremities; full neck range of motion; normal coordination; normal gait, including tandem walking; normal station; and no sensory deficits (tr. 396, 398, 575, 594, 605, 608, 611, 626, 628, 630, 632, 657, 667, 677, 680, 720, 733; *see also* tr. 41). Additionally, Dr. Krishnamurthy considered Plaintiff's obesity and determined she could perform work with the same postural limitations as those set forth in the RFC (*compare* tr. 40 *with* 148–49). And more than one treating physician encouraged Plaintiff to engage in regular physical exercise. For these reasons, the ALJ did not err in his consideration of Plaintiff's obesity and in determining her RFC.

2.  Opinion Evidence of Record

The Eleventh Circuit has noted that the focus of any RFC assessment is on the doctors' evaluations of a claimant's condition and the resulting medical consequences. *See* Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). An ALJ must consider and evaluate every medical opinion received. *See* 20 C.F.R. § 404.1527. Additionally, in assessing the medical evidence the ALJ must "state with particularity the weight he gave the different medical opinions and the reasons therefor." Sharfarz v. Bowen, 825 F.2d 278, 279 (11th Cir. 1987) (citing MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986)). Thus, while it is true that the determination of disability under the Act is reserved to the Commissioner, the ALJ is nevertheless required to consider and explain the weight given to opinions of medical doctors. *See generally* 20 C.F.R. § 404.1527; *see also* McCloud v. Barnhart, 166 F. App'x 410, 419 (11th Cir. 2006) (unpublished) (remanding where ALJ did not explain weight given to consulting psychologist's report or the reasons for discrediting his opinion).[8] Although the ALJ has wide latitude to evaluate the weight of the evidence, he must do so in accordance with prevailing precedent. Pursuant to the regulations, the weight

---

[8] The undersigned cites McCloud and other unpublished cases herein only as persuasive authority and recognizes that such opinions are not considered binding precedent. *See* U.S. Ct. of App. 11th Cir. Rule 36-2. The undersigned does the same with respect to opinions of circuit courts of appeals other than the Eleventh Circuit, *see* United States v. Rosenthal, 763 F.2d 1291, 1294 n.4 (11th Cir. 1985), and any district court opinions cited herein.

an ALJ must give medical opinions varies according to the relationship between the medical professional and the claimant. 20 C.F.R. § 404.1527(c). For example, the opinions of examining physicians are generally given more weight than non-examining physicians, treating physicians' opinions receive more weight than the opinions of non-treating physicians' opinions, and specialists' opinions on issues within their areas of expertise receive more weight than non-specialists' opinions. *See id*.; Preston v. Astrue, No. 2:09cv0485/SRW, 2010 WL 2465530, at *6 (N.D. Ala. June 15, 2010). With respect to non-examining state agency medical consultants or other program physicians, the regulations explain that an ALJ is required to consider their opinions because they "are highly qualified physicians . . . who are also experts in Social Security disability evaluation." *See* 20 C.F.R. § 404.1527(e). An ALJ may rely on opinions of non-examining sources when they do not conflict with those of examining sources. Edwards v. Sullivan, 937 F.2d 580, 584–85 (11th Cir. 1991). Where the ALJ has discounted the opinion of an examining source properly, however, the ALJ may rely on the contrary opinions of non-examining sources. *See* Milner v. Barnhart, 275 F. App'x 947 (11th Cir. 2008) (unpublished).

Moreover, an ALJ may consider various factors when weighing medical opinions, including: (1) the examining relationship; (2) the nature, extent, and length of the treatment relationship; (3) whether the medical source presents relevant

evidence to support an opinion; (4) whether an opinion is consistent with the record;

(5) whether or not the doctor is a specialist; and (6) "any other factors" which tend to

support or contradict the opinion. *See* 20 C.F.R. § 404.1527(c)(1)–(6).

<u>Neda Koehnemann, One-Time Consultative Examiner</u>

Plaintiff contends the ALJ erred in giving "little weight" to the opinions of Dr.

Koehnemann, who examined Plaintiff once in April of 2016 at the request of her

counsel. The ALJ discussed Dr. Koehnemann's examination and noted her findings,

namely, that Plaintiff has "significant memory deficits"; that her "level of anxiety and

depression likely adversely affects her memory functioning"; that she "very much is

in need of medical insurance and appropriate mental health medications"; and that she

"needs to have psychiatric treatment and counseling to reduce her level of emotional

distress" (tr. 673, *see also* tr. 44).

In claiming that the ALJ erred in discounting these opinions, Plaintiff first

asserts that the ALJ did not discuss the objective testing performed by Dr.

Koehnemann. This is simply incorrect, as the only test utilized by Dr. Koehnemann

was the Wechsler Memory Scale (*see* tr. 670), and the ALJ specifically acknowledged

the results of this testing (tr. 43).

Plaintiff then argues that the ALJ erred in discounting the opinions of Dr.

Koehnemann on grounds that she included no specific functional analysis of

Plaintiff's mental abilities. Plaintiff contends that such a finding is "entirely contrary to the Commissioner's applicable regulations" (ECF No. 22 at 11), specifically 20 C.F.R. § 404.1513(b)(6), which states: "the lack of the medical source statement will not make a report incomplete." The Regulation states as much, but the ALJ did not reject the opinions as incomplete; the ALJ simply declined to afford them full weight. And in affording them less than full weight, the ALJ pointed out that Dr. Koehnemann observed that there was no evidence of a thought disorder, that Plaintiff was oriented in all spheres, and that Plaintiff reported to Dr. Koehnemann she had never previously obtained mental health counseling—*in addition to* noting that Dr. Koehnemann imposed no social, occupational, or functional mental restrictions (*see* tr. 44).[9]

The ALJ also considered Plaintiff's statement to Dr. Koehnemann that her "primary relaxation is playing games on her phone because it allows her to forget about other things" (tr. 670). Plaintiff contends the ALJ erroneously relied on this statement as evidence of an ability to sustain concentration on work-related tasks for two-hour blocks of time, but Plaintiff mischaracterizes the ALJ's findings. The ALJ did not find Plaintiff able to concentrate for two-hour blocks of time *simply because*

---

[9] It bears repeating that *Plaintiff's counsel* referred her to Dr. Koehnemann for the consultative examination, not the Commissioner, as is customarily done. Had the Commissioner made the referral, Dr. Koehnemann would have been requested to provide a medical source statement. *See* 20 C.F.R. § 404.1513(b)(6). Thus, the lack of a medical source statement in this instance is due to Plaintiff's failure to secure one in connection with the evaluation.

she is able to concentrate on games on her phone. The ALJ considered Plaintiff's statement in conjunction with the other evidence of record in formulating Plaintiff's RFC and in generally concluding that Plaintiff did not have severe or disabling deficits in concentration or memory (*see, e.g.*, tr. 39, 45). Stated differently, the ALJ found Plaintiff's ability to focus on playing games on her phone while simultaneously "forget[ting] about other things," to be generally consistent with the limitations in concentration, persistence, and pace set forth in the RFC (*see* tr. 39). The ALJ did not err in so finding.

Plaintiff additionally complains that the ALJ did not recite each factor set forth in § 404.1527(c) in weighing the opinions of Dr. Koehnemann. There is no error in this regard because an ALJ is not required to articulate his consideration of each and every factor when weighing the varying pieces of medical evidence. Oldham v. Astrue, 509 F.3d 1254, 1258 (10th Cir. 2007) (indicating that although an ALJ should consider all of the relevant § 404.1527(c) factors, it is not necessary to explicitly discuss every factor). Likewise, there is no requirement that an ALJ reference every piece of evidence in his decision. *See* Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005) ("there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision," as long as the ALJ's decision "is not a broad rejection which is 'not enough to enable [the district court or this court] to conclude that [the

ALJ] considered her medical condition as a whole.'") (quoting <u>Foote</u>, 67 F.3d at 1561).

As a final matter, because Dr. Koehnemann examined Plaintiff only once, the opinions generated from this examination are not entitled to the same weight as those of a treating physician. *See* <u>Gibson v. Heckler</u>, 779 F.2d 619, 623 (11th Cir. 1986) (rule giving great weight to physician's opinion does not apply where physician has only examined patient one time).

For all of these reasons, the court finds the ALJ properly considered Dr. Koehnemann's opinions and did not err in affording less than full weight to them.

<u>Frances Martinez and Steven Wise, Non-Examining Agency Psychologists</u>

Plaintiff argues that the ALJ based his mental RFC upon his own interpretation of the evidence and inappropriately discounted the opinions of Drs. Martinez and Wise.

Plaintiff's argument is somewhat unclear, but to reiterate, Dr. Martinez offered her opinions in May of 2014 at the initial level, and Dr. Wise offered his opinions in July of 2014, in connection with Plaintiff's request for reconsideration. In pertinent part, their opinions are the same, with the primary difference being that Dr. Martinez commented that Plaintiff can "perform simple routine tasks in a stable setting and adapt to changes over time" (tr. 117), while Dr. Wise commented that Plaintiff would

"do best in less complex tasks and those not requiring extended concentration" (tr.

150). Dr. Wise additionally noted that Plaintiff's abilities with respect to attention and

concentration were within normal limits according to the medical evidence of record

at the reconsideration level (*id*.).

The ALJ referenced the findings of each non-examining consultant and, while

he gave "greater weight" to Dr. Wise's opinions, he ultimately assigned each opinion

"some weight" (tr. 44). Plaintiff complains that the ALJ erred in failing to fully

incorporate the opinions of one or the other consultant into the RFC. There is no

requirement that the ALJ do so. *See, e.g.*, Chapo v. Astrue, 682 F.3d 1285, 1288–89

(10th Cir. 2012) ("there is no requirement in the regulations for a direct

correspondence between an RFC finding and a specific medical opinion on the

functional capacity in question"); Howard v. Barnhart, 379 F.3d 945, 949 (10th Cir.

2004) (noting that an ALJ, not a physician, is charged with determining a claimant's

RFC from the medical record, and rejecting the argument "that there must be specific,

affirmative, medical evidence on the record as to each requirement of an exertional

work level before an ALJ can determine RFC within that category") (citations

omitted); *see also* 20 C.F.R. § 404.1546(c) (stating that the ALJ is "responsible for

assessing your [RFC]").

Having carefully reviewed both consultants' opinions, and the ALJ's RFC determination, the court discerns no error. The conclusions reached by Dr. Martinez and Dr. Wise are, as previously noted, nearly identical. They are also generally consistent with the ALJ's RFC determination that Plaintiff can "perform simple, routine, repetitive tasks, [and] can maintain concentration, persistence, and pace for these simple, routine, repetitive tasks for at least two hours at a time; and can adapt to occasional changes" (tr. 40).

### Dawn Frost, Nurse Practitioner

Plaintiff also takes issue with ALJ's assignment of "little weight" to the opinion of NP Frost that Plaintiff "cannot work" and is "unable to perform satisfactorily" (tr. 44, 568). The ALJ appropriately disregarded these conclusions. *See* 20 C.F.R. § 404.1527(d)(1) (a finding of disability or inability to work by a medical source does not mean that the Commissioner will automatically reach the same conclusion); SSR 96-5p (whether an individual is disabled is a question reserved to the Commissioner; treating source opinions on such questions are "never entitled to controlling weight or special significance").

The ALJ also noted, correctly, that NP Frost is not an "acceptable medical source" qualified to give a medical opinion under the regulations (tr. 44). *See* 20 C.F.R. § 404.1513(a) (listing acceptable medical sources). And the ALJ pointed to

NP Frost's lack of special mental health training—also an appropriate consideration. *See* 20 C.F.R. § 1527(c)(5) (generally more weight is given to the medical opinion of a specialist than to the medical opinion of a source who is not a specialist). To be sure, NP Frost herself noted that her "specialty" was family medicine, not psychology. Additionally, as the ALJ found, NP Frost's opinions were based on a "check the box, short answer format, with no narrative showing treatment visit complaints, examination results, or testing to explain and substantiate her opinion" (tr. at 44). The ALJ properly considered this factor in weighing NP Frost's opinions. *See* 20 C.F.R. § 404.1527(c)(3) (more weight will be given when a medical source presents relevant evidence and explanation for a medical opinion); *see also* <u>Hammersley v. Astrue</u>, No. 5:08cv245-Oc-10GRJ, 2009 WL 3053707, at *6 (M.D. Fla. Sept. 18, 2009) ("check-off forms . . . have limited probative value because they are conclusory and provide little narrative or insight into the reasons behind the conclusions") (citing <u>Spencer ex rel. Spencer v. Heckler</u>, 765 F.2d 1090, 1094 (11th Cir. 1985) (rejecting opinion from a non-examining physician who merely checked boxes on a form without providing any explanation for his conclusions); <u>Mason v. Shalala</u>, 994 F.2d 1058, 1065 (3d Cir. 1993) (noting that "[f]orm reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best.")). Brief and conclusory statements that are not supported by medical findings, *even if made*

*by a treating physician*, are not persuasive evidence of disability.  Warncke v. Harris,

619 F.2d 412, 417 (5th Cir. 1980); Johns v. Bowen, 821 F.2d 551, 555 (11th Cir.

1987).

For all of these reasons, the ALJ did not err in assigning "little weight" to the

opinions of NP Frost.

P.S. Krishnamurthy, Non-examining Agency Physician

Although Plaintiff testified that she can only walk for thirty minutes at a time,

stand for fifteen minutes at time, sit for "about an hour," and lift "about ten pounds"

(tr. 91), Dr. Krishnamurthy found Plaintiff to have greater physical capabilities, as

detailed above.  Ultimately, Dr. Krishnamurthy opined that Plaintiff could perform

"light" work (tr. 152).  The ALJ, however, limited Plaintiff to sedentary work, with

equal or lesser abilities than those set forth by Dr. Krishnamurthy.  In so doing, the

ALJ stated that "out of an abundance of caution" he would reduce Plaintiff's

exertional level to "sedentary," as he found that level to be more in line with her

hearing testimony (tr. 43).

Plaintiff asserts error on the ground that the ALJ did not apply the same

reasoning with respect to other aspects of the RFC determination (i.e., the *entire* RFC

should have mirrored Plaintiff's testimony because the ALJ determined that exertional

level would correspond with the testimony).  The court finds this argument to be

without merit, as the ALJ was not required to accept all of her testimony.  Moreover, the ALJ stated he was reducing the exertional level "in an abundance of caution," suggesting he believed Dr. Krishnamurthy's opinions to be accurate and supported by the record, such that all of his opinions could have been adopted.  Rather than adopt all of his opinions, however, the ALJ found Plaintiff to be *less* capable than Dr. Krishnamurthy opined, and thus made a determination that *favored* Plaintiff—yet she cries foul.  Under similar circumstances, the Tenth Circuit found no error, stating that although "[t]he ALJ could have been more explicit in tying this mitigating gesture to evidence in the record, [] we are aware of no controlling authority holding that the full adverse force of a medical opinion cannot be moderated favorably in this way unless the ALJ provides an explanation for extending the claimant such a benefit."  Chapo, 682 F.3d at 1288.  The undersigned likewise finds no error here.

C.      Moderate Limitation in Concentration, Persistence, or Pace

In determining at an early step of the sequential evaluation that Plaintiff's anxiety disorder and depressive disorder did not meet or equal the criteria of the relevant listings, the ALJ found that Plaintiff had "moderate" difficulties with regard to concentration, persistence, and pace (tr. 39).  At a later step, in formulating Plaintiff's RFC, the ALJ did not repeat this precise limitation but instead limited Plaintiff to performing simple, routine, repetitive tasks and "maintain[ing]

concentration, persistence, and pace for these simple, routine, repetitive tasks" for two hours at a time, and he permitted only occasional changes in the workplace setting (tr. 40). The ALJ ultimately determined Plaintiff was not disabled, based on the VE's testimony that Plaintiff could perform various unskilled jobs with this RFC.

Plaintiff contends the ALJ erred in omitting the "moderate" limitations in concentration, persistence, and pace from the hypothetical questions posed to the VE, which—because the hypothetical question tracks the RFC—is in effect a claim that the RFC determination is flawed.

In support, Plaintiff relies exclusively on Winschel v. Commissioner of Social Sec., 631 F.3d 1176, 1181 (11th Cir. 2011). In Winschel:

> [T]he AJL determined at step two that Winschel's mental impairments caused a moderate limitation in maintaining concentration, persistence, and pace. But the ALJ did not indicate that medical evidence suggested Winschel's ability to work was unaffected by this limitation, nor did he otherwise implicitly account for the limitation in the hypothetical. Consequently, the ALJ should have explicitly included the limitation in his hypothetical question to the vocational expert."

*Id*.

Plaintiff appears to contend that Winschel held that a limitation to simple, routine tasks or unskilled work can never account for moderate limitations in concentration, persistence, or pace (*see* ECF No. 22 at 6–7). But this is not the holding. As the Eleventh Circuit has clarified, "limiting the hypothetical questions

to include only unskilled work sufficiently accounts for the claimant's limitations in maintaining his concentration, persistence, or pace *where the medical evidence demonstrates that the claimant can engage in simple, routine tasks or unskilled work despite his limitations*." Jacobs v. Comm'r of Soc. Sec., 520 F. App'x 948, 950–51 (11th Cir. 2013) (citing Winschel, 631 F.3d at 1180) (emphasis added). And here, the evidence of record in fact demonstrates that Plaintiff can engage in simple, routine, repetitive tasks, with only occasional changes in the work setting, despite her limitations. For example, Dr. Wise opined that despite having moderate limitations in concentration, persistence, or pace, Plaintiff was able to perform simple, routine, repetitive work in a stable setting, that is, one with only occasional changes (*see* tr. 112–13, 117, 145–46, 151). Likewise, treatment notes show Plaintiff could follow simple and complex commands, had normal memory, was able to recall events, had no impairments in judgment and insight, and had normal ability to calculate, normal attention span, and normal ability to abstract (tr. 575, 594, 604, 608, 611, 624, 628, 630, 632, 666).

Additionally, or alternatively, Winschel instructs that if an ALJ does not explicitly include moderate limitations in maintaining concentration, persistence, and pace in the hypothetical questions posed to the VE, he may implicitly account for such limitations in the questions. Here, it appears the ALJ implicitly accounted for

Plaintiff's moderate limitations by restricting tasks to two-hour increments (and permitting only occasional changes in the workplace setting). *See* <u>Jarrett v. Commissioner of Social Sec.</u>, 422 F. App'x 869, 871 (11th Cir. 2011) (hypothetical questions adequately accounted for "moderate difficulties" in concentration, persistence, and pace where ALJ asked the VE to assume a person who could only "understand, remember, [and] carry-out simple . . . tasks and concentrate for brief periods of time"). Thus, as the moderate limitations appear to have been implicitly taken into account, the ALJ did not err.

VI.     CONCLUSION

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed. 42 U.S.C. § 405(g); <u>Lewis</u>, 125 F. 3d at 1439; <u>Foote</u>, 67 F.3d at1560. Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Accordingly, it is hereby **ORDERED**:

1.     That the decision of the Commissioner is **AFFIRMED**, and this action is **DISMISSED**.

2.     That **JUDGMENT** is entered, pursuant to sentence four of 42 U.S.C. § 405(g), **AFFIRMING** the decision of the Commissioner.

3.     That the Clerk is directed to close the file.

At Pensacola, Florida this <u>31</u><sup>st</sup> day of January 2019.

<u>/s/ *Elizabeth M. Timothy*</u>
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**